NOTE:  This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**CONTRACK WATTS-UEJO KOGYO JV,**
*Appellant*

**v.**

**SECRETARY OF THE ARMY,**
*Appellee*

---

2023-1373

---

Appeal from the Armed Services Board of Contract Appeals in Nos. 63211, 63212, 63213, 63214, 63215, Administrative Judge J. Reid Prouty, Administrative Judge Mark A. Melnick, Administrative Judge Richard Shackleford.

---

Decided:  September 16, 2024

---

ZACHARY FLETCHER JACOBSON, Seyfarth Shaw LLP, Washington, DC, argued for appellant.  Also represented by SARA BEIRO FARABOW, JEFFREY M. HUMMEL, MICHAEL EDWARD WAGNER, JR.

GEOFFREY M. LONG, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for appellee.  Also represented by BRIAN

2  CONTRACK WATTS-UEJO KOGYO JV v. SECRETARY OF THE ARMY

M. BOYNTON, MARTIN F. HOCKEY, JR., PATRICIA M. MCCARTHY.

———————————

Before LOURIE, CLEVENGER, and HUGHES, *Circuit Judges.*

HUGHES, *Circuit Judge.*

Contrack Watts, Inc. and Uejo Kogyo K.K., two parties in a joint venture for federal procurement, appeal the Armed Services Board of Contract Appeals' decision that it lacked jurisdiction to review the joint venture's appeal because the underlying claim was invalidly submitted. Because we hold that the claim was submitted by a party not authorized to bind the joint venture, we affirm.

I

A

Contrack Watts, Inc. (CWI) and Uejo Kogyo K.K. (UK) entered into a joint venture agreement to bid for a federal contract, effective April 1, 2016. *See* Federal Acquisition Regulation (FAR) 125.8(a) ("A joint venture of two or more business concerns may submit an offer as a small business for a Federal procurement, subcontract or sale so long as each [business] is small under the size standard corresponding to . . . the contract."). The two parties planned to bid for a solicitation issued by the United States Army Corps of Engineers (Corps) for construction services in Japan. CWI and UK agreed "to combine their efforts for the Execution of the Project and to jointly execute the Works in accordance with the specifications [and] conditions of the Contract resulting from [the solicitation for proposals], on the basis set forth in [the] Agreement." J.A. 26. Article 3 of the joint venture agreement, titled "General Obligations of the Parties" establishes each party's authority to act for the joint venture, stating:

> 3.1 No Party shall except with the prior consent of the other Party make, directly or indirectly, solely

> or in association with others, any agreement with the Employer or any third party in connection to the Project. . . .
>
> 3.4. No Party shall have the authority to bind or to make any commitment on behalf of the JV or of any other Party unless such authority is expressed in writing by Parties jointly in regard to the JV or by a Party individually in regard to the other Party.

J.A. 27.

Article 5 of the agreement, titled "Lead Party," specifies the roles of the parties:

> It is mutually agreed that Mr. Wahid Hakki, CEO of Contrack Watts is nominated as the Chairman, and Mr. Shinko Uejo, President of Uejo Kogyo is nominated as the Vice Chairman of the Board of the Joint Venture.
>
> It has been agreed that Mr. Wahid Hakki, CEO of Contrack Watts will act as the Program Manager and will be representing the Joint Venture in all aspects related to communication with the Employer and the operation performance. Also, all active progress details shall be reported to him through documentation.

J.A. 28.

Article 6 of the agreement also establishes a "Supervisory Board" for the joint venture. The parties agreed to appoint three members from CWI and three members from UK to the Supervisory Board. Article 6 establishes the Supervisory Board's responsibilities and outlines a consensus-based decision-making process, as follows:

> 6.3 The Supervisory Board will establish within the first two (2) months systems and should be responsible for discussing and making decisions on the general policy of the Joint Venture for the

execution of the Contract, Performance of the Works, and financial matters. . . .

6.7 Each party shall have one vote at the Board (irrespective of the number of members attending) and decisions of the Board shall be taken unanimously. If unanimity cannot be achieved, then the meeting shall be adjourned for twenty four (24) hours or any other date mutually agreed between the Parties. If unanimity is still not achieved, the meeting shall be reconvened within seven (7) days or any other date mutually agreed between the Parties and the members shall attempt to finally reach a unanimous decision.

J.A. 28–29.

The joint venture agreement states that it will be construed in accordance with the substantive laws of the United States and Japan, and creates the following dispute resolution procedure:

The Parties shall make their best efforts to settle amicably any and all disputes which may arise out of or in connection with the present Agreement. If such dispute is not settled amicably in a period of fourteen (14) days, said dispute shall be finally settled by the Supervisory Board in a duration limited to thirty (30) days.

J.A. 30. And the agreement may only be changed, modified, or amended in a writing "duly executed by all the Parties." *Id.*

### B

On December 19, 2016, the Corps awarded the CWI-UK joint venture a multiple award task order contract (MATOC), Contract No. W912HV-17-D-0013. *See* JA. 36–39. The contract was signed for the joint venture by two members of the joint venture's Supervisory Board, namely

Jason Roberts of CWI and Masando Katakura of UK. J.A. 37–38. On the same date, the Corps issued Task Order No. 0001, for the design and construction of a child development center in Yokosuka, Japan.

On December 23, 2016, the Chief Operating Officer of CWI and the President of UK signed a letter appointing six individuals as "authorized representatives" of the joint venture for the MATOC. J.A. 929–30 (hereinafter, December 2016 letter). The six individuals, who signed an acknowledgement included in the letter, were also members of the joint venture's Supervisory Board. The appointment letter stated that "[a]s an authorized representative, the [listed] individuals may sign proposals, modifications, bonds, final payment paperwork, and take any other necessary actions on behalf of [the JV] for the aforementioned contract." J.A. 929.

On August 25, 2017, Mr. Roberts, an authorized representative of the joint venture per the December 2016 letter, executed the joint venture's offer for a task order to construct a Company Operations Complex in Kyogamisaki, Japan. On September 28, 2017, the government issued CWI-UK Task Order No. W912HV17F0046 (the -0046 task order). J.A. 932.

Approximately three years later, on December 1, 2020, CWI attempted to unilaterally withdraw Mr. Roberts and Ihab Demian from the Supervisory Board of the joint venture and appoint Omar El Bassiouny and Mourad Azmy by means of a resolution issued by CWI's board. Soon after, the Corps received a document, in which T. Ryan Lamb, the General Counsel and Secretary of CWI, attempted to unilaterally appoint David Rutherford and Takao Kakoto as project managers for the joint venture, with the ability to make contract modifications at or under $100,000. In response, on December 14, 2020, the Corps' contracting officer noted that the Corps had no record of Mr. Lamb being authorized to act on behalf of the joint venture. The

contracting officer therefore requested an updated project manager authorization letter signed by one of the authorized representatives of the joint venture. The Corps also requested an updated authorized representatives list for the joint venture, if necessary, due to Mr. Roberts' departure.

Notwithstanding the Corps' then-pending request for updated information regarding authorized representatives, on December 24, 2020, David Rutherford of CWI sent a cost proposal settlement offer pertaining to the -0046 task order, using joint venture letterhead. J.A. 4196. And on December 30, 2020, another individual associated with CWI, Frank McConnell, submitted a request for equitable adjustment (REA), again relating to the -0046 task order and again on joint venture letterhead. J.A. 4318, *see also Reflectone, Inc. v. Dalton*, 60 F.3d 1572, 1577 (Fed. Cir. 1995) (An REA is a remedy "payable . . . when unforeseen or unintended circumstances, such as government modification of the contract, differing site conditions, defective or late-delivered government property or issuance of a stop work order, cause an increase in contract performance costs."). On the same day, the Corps repeated its request that the joint venture provide updated information regarding its authorized representatives. J.A. 4305. Despite this request, Mr. McConnell submitted a second REA in relation to the -0046 task order the next day. *See* J.A. 4535–49.

In response to the first REA, dated December 30, 2020, the Corps noted that Mr. McConnell did not possess authority to certify the REA on behalf of the joint venture. J.A. 4663. The Corps asked the joint venture to either provide documentation demonstrating Mr. McConnell's authority to act on behalf of the joint venture or resubmit the REA with a certification from an authorized representative. The Corps also asked that any update to the list of authorized individuals be signed by both CWI and UK, in order to demonstrate both joint venture members' consent

for a given individual to act on behalf of the joint venture. *Id.*

On January 15, 2021, CWI provided the Corps with a letter from UK, signed by Kiyoshi Kinjo, UK's general manager. J.A. 4705; *see also* J.A. 4689 (CWI transmission of letter). The letter is addressed to "Contract Watts, Attn: Kevin McClain." J.A. 4705. UK stated in the letter that it was "aware [of] the following members as members of the JV committee," and identified six individuals (three from each joint venture party), including Kevin McClain and Omar El Bassiouny of CWI. J.A. 4705. UK also stated that "all matters . . . must be approved by the JV committee members listed above." J.A. 4705.

On January 22, 2021, UK sent a letter to the Corps regarding the -0046 task order, which UK referred to as the "Kyogamisaki Contract." J.A. 4707–08. UK "request[ed the Corps] to keep all the remaining and/or future payment to CWI-UK regarding the Kyogamisaki Contract on hold (i.e., to stop the payment to CWI-UK) until we approve it." J.A. 4707. UK asserted that the joint venture owed payment to UK, and that the joint venture's bank account was controlled by CWI. UK added that "there have been various issues regarding management of CWI-UK and its construction projects on which CWI and Uejo Kogyo cannot reach consensus." J.A. 4708.

The Corps' contracting officer responded to UK on January 29, 2021, stating that the Corps generally would not get involved in disputes between joint venture parties, and that the government generally must make prompt payment of properly submitted invoices. J.A. 4709. On the same day, the contracting officer sent a letter to the joint venture regarding UK's January 15 letter, addressing the composition of the joint venture's Supervisory Board. J.A. 4710–11. The contracting officer gave five reasons why the January 15 letter did not properly designate individuals to act on behalf of the joint venture, including that the letter

was only signed by one joint venture party, namely UK. J.A. 4710. Further, the contracting officer noted that the language in the letter stating that "all matters listed must be approved by the JV committee members listed above" implied that all the joint venture committee members must approve the listed matters. *Id.* The Corps stated that, given the unsuccessful attempted delegation in the January 15 letter and UK's January 22 request that the Corps withhold payment, the Corps no longer viewed the December 2016 joint venture representative authorization letter to be valid. J.A. 4711. The Corps stated that it would require all matters related to the joint venture to be signed by both parties until the Corps received an acceptable updated list of authorized signatories to act on behalf of the joint venture. *Id.*

Despite the Corps' directive in the January 29, 2021, letter, various individuals associated with CWI continued to submit invoices to the Corps. *See* J.A. 4718–19, 4728, 4732–33. The Corps rejected these invoices because they were not signed by both joint venture parties, nor by an authorized individual designated by both parties to act on behalf of the joint venture. J.A. 4768–69. The Corps also requested an explanation from the joint venture's corporate officers of where the joint venture stood with respect to authorization to sign for and bind the joint venture. J.A. 4769.

Mr. El Bassiouny, the General Manager of CWI, sent the Corps a letter on February 24, 2021, purporting to agree with UK's January 15 letter and asserting that the joint venture representative designations in the letter were approved by both joint venture parties in accordance with Article 3.4 of the joint venture agreement. J.A. 4776. Mr. El Bassiouny further asserted that it was improper for the Corps to withhold invoice payments, and that Kevin McClain had replaced Wahid Hakki as the joint venture Chairman/Program Manager. J.A. 4777. The next day, UK sent the Corps another letter stating that UK believed CWI

had violated the joint venture agreement and that the parties were engaged in a legal dispute in Japan. J.A. 4779–80. UK requested that the government "not approve the Contrack Watts Inc on its own decision [sic]." J.A. 4779. In response to these two letters, the Corps reiterated its position that all matters related to the joint venture be signed by both parties until the Corps received an acceptable updated list of authorized signers to act on behalf of the joint venture. J.A. 4783–84.

On March 19, 2021, Mr. El Bassiouny sent a letter on joint venture letterhead, requesting an equitable adjustment. J.A. 4795–801. Following up on March 25, 2021, the law firm Seyfarth Shaw LLP (Seyfarth), claiming to "represent Contrack Watts, Inc.," J.A. 4863, sent a letter to the Corps demanding that the Corps release certain funds and review a pending REA. J.A. 4863–69. Seyfarth contended that CWI had authority to act on behalf of the joint venture and that "Kevin McClain of CWI ha[d] replaced Mr. Wahid Hakki as JV Chairman," by way of the January 15 letter from UK. J.A. 4865 n.1. Seyfarth also accused UK and the Corps of engaging in "active interference" with CWI's performance and financing of the contract. J.A. 4869.

Two days later, UK wrote to the Corps and stated that UK was not informed in advance of Seyfarth's letter, and that UK was "deeply puzzled" by CWI's position. J.A. 4875–76. UK referred to the attorney who signed the Seyfarth letter as "legal counsel to CWI" and indicated that CWI had not advised UK of the letter in advance. J.A. 4875. In a letter dated April 12, 2021, UK further denied that Mr. McClain was granted any power to act without the approval of the joint venture members. J.A. 4880. Additional correspondence followed. J.A. 4882–83 (Corps letter dated April 16, 2021); J.A. 4900–01 (UK letter dated May 12, 2021). A meeting was held between the Corps and the joint venture parties on May 18, 2021, at which resolution of the authorization issue was discussed, and a follow-up meeting was planned. *See* J.A. 4902–03. No resolution was reached.

The Corps therefore continued to demand that joint venture submissions be signed by both joint venture parties until an acceptable joint designation of representatives authorized to act on behalf of the joint venture was submitted. J.A. 4950.

On September 28, 2021, Mr. El Bassiouny of CWI submitted a request for a contracting officer's final decision on certain claims arising from the MATOC. J.A. 4963–78. Mr. El Bassiouny identified himself as "General Manager, Contrack Watts, Inc." and as "Authorized Signatory of the Contrack Watts-Uego [sic] Kogyo Joint Venture." J.A. 4977. Two days later, UK wrote to the Corps to object to the unilateral purported claim of CWI. J.A. 5547–48. UK noted that it had disagreed with a draft of the claim it reviewed, which UK believed contained descriptions that were "at odds with reality." J.A. 5547. On December 1, 2021, the Corps' contracting officer responded to the joint venture, stating that the September 28 attempted claim was not certified by an individual authorized to bind the joint venture. J.A. 6716–17.

C

On February 28, 2022, Seyfarth—claiming to represent the "Contrack Watts-Uejo Kogyo Joint Venture"—filed a notice of appeal of the contracting officer's rejection of the attempted claim with the Armed Services Board of Contract Appeals (ASBCA or Board). The appeal alleged the ASBCA's jurisdiction pursuant to the Contract Disputes Act (CDA), 41 U.S.C. § 7101, *et seq.*, and the disputes clause of the MATOC.[1] J.A. 5557. In a declaration, Mr. El

---

[1]    The ASBCA docketed CWI's claim into five separate appeals. J.A. 6718. As the threshold issue in each appeal is who was authorized to bring a claim on behalf of the joint venture, we refer to the asserted claim as one appeal for simplicity.

Bassiouny asserted that he "engaged Seyfarth on behalf of CWI," allegedly "to represent the JV's interests" in the Board appeal. J.A. 6866. Mr. El Bassiouny also asserted that "[w]hile [he] was not an original JV management committee member," "the JV partners subsequently appointed [him] as an authorized representative and agreed [he] could take action on behalf of the JV." J.A. 6865. He further claimed that "even though the management committee members changed, CWI remained as the lead party and managing member of the JV." *Id.*

The Corps moved to dismiss the appeal for lack of jurisdiction, and the Board granted the Corps' motion. The Board held that "the claim was not submitted, and the appeals not authorized, by an individual with authority to do so and to retain counsel for that purpose, which deprive[d] the Board of jurisdiction." J.A. 4 (footnote omitted). The Board noted that pursuant to the CDA, only a contractor may submit a certified claim to the contracting officer. J.A. 5 (citing 41 U.S.C. § 7103(a)). Similarly, the Board noted that only a contractor may bring an appeal to the Board. *Id.* (citing 41 U.S.C. § 7104(a)).

The Board continued that where a joint venture contracts with the government, the joint venture is in privity with the government, and the partners in their own capacity cannot submit a claim and bring an appeal. J.A. 5. The Board also cited precedent from our court holding that the person or entity acting on behalf of a joint venture must possess authority to bind it as to a claim. *Id.* (citing *Kiewit/Tulsa-Houston v. United States*, 981 F.2d 531, 533 (Fed. Cir. 1992)). The Board stated that "[t]he general rule is that each member of a joint venture has the authority to act for and bind the enterprise, absent agreement to the contrary[.]" J.A. 5 (quoting *Sadelmi Joint Venture v. Dalton*, 5 F.3d 510, 513 (Fed. Cir. 1993)). Thus, in the Board's view, the pertinent question in the appeal was whether an authorized person acted to pursue the purported joint venture claim. J.A. 5.

The Board noted that the appellant did not contest that the claim and appeal were brought without the consent of UK. J.A. 6 n.3. Instead, Mr. El Bassiouny asserted that he had been appointed as a representative of the joint venture in the January 15, 2021, letter, and that he could take action on behalf of the joint venture and engage legal counsel. *See* J.A. 6764–66. The Board rejected this contention, concluding that "[a] sensible reading" of the joint venture agreement, "giving meaning to all the agreement's provisions, leads to the conclusion that Mr. El Bassiouny lacks the authority he claims." J.A. 6. The Board concluded that while the original members of the joint venture's Supervisory Board had been "authorized to sign proposals, bonds, final payment paperwork, and take any other necessary actions on behalf of the JV for the contract," Mr. El Bassiouny was not authorized to complete such tasks. J.A. 6. The Board acknowledged the appellant's argument that Mr. El Bassiouny was identified in the letter dated January 15, 2021, but the Board found that the letter constrained the power of the listed individuals by mandating that "all matters must be approved by the JV committee members listed above." *Id.* "Considered as a whole," the Board concluded, "the letter reflect[ed] a grant to individual board members of signatory authority over the described matters after they have been approved by the [JV] board." J.A 6–7. Per the Board, the letter therefore did not empower Mr. El Bassiouny to act unilaterally on behalf of the joint venture. J.A. 7.

The Board also rejected the appellant's contention that Article 5 of the joint venture agreement designated CWI as the managing member of the joint venture, with authorization to hire counsel and prosecute claims. *Id.* While Article 5 of the joint venture agreement designated Mr. Hakki, CEO of Contrack Watts, to act as Program Manager, the Board held that "[r]egardless of the exact scope of the powers described by Article 5, one thing is certain, it grants nothing to Mr. El Bassiouny." *Id.* Rather, the Board held

that "Mr. El Bassiouny was not authorized by the JV agreement . . . to unilaterally pursue a claim, retain counsel, and prosecute these appeals on behalf of the JV without the approval of the JV's Supervisory Board." J.A. 8. Moreover, the Board held that "[g]iven . . . Mr. El Bassiouny was only authorized to commit the JV to retain outside counsel with the approval of the JV's Supervisory Board, appellant's counsel is not a duly authorized representative" as required by Board Rule 15. *Id.*

Ultimately, the Board held that the joint venture agreement's provisions barring either party from making commitments without the consent of the other, and the parties' declaration that a Supervisory Board member's actions must be approved by the Supervisory Board, combined with the agreement's mandate that decisions of the Supervisory Board be unanimous, reflect an intent by both parties "to ensure that any one of the board's members cannot hijack the organization." J.A. 8–9. The Board therefore dismissed the appeals for lack of jurisdiction, refusing to consider the appellant's arguments regarding the merits of the appeal. *Id.* CWI-UK now appeals the ASBCA's dismissal to our court. We have exclusive jurisdiction under 28 U.S.C. § 1295(a)(10) "of an appeal from a final decision of an agency board of contract appeals pursuant to section 7107(a)(1) of title 41."

II

Pursuant to the CDA, 41 U.S.C. § 7107(b)(1), we review the ASBCA's decisions on questions of law de novo. *Gen. Dynamics Corp. v. Panetta*, 714 F.3d 1375, 1378 (Fed. Cir. 2013). Whether the Board had jurisdiction is a question of law. *Newport News Shipbuilding & Dry Dock Co. v. Garrett*, 6 F.3d 1547, 1550 (Fed. Cir. 1993).

III

The Board's jurisdiction of an appeal pursuant to the CDA is predicated on the submission of a valid claim by a

contractor that is eligible for appeal. 41 U.S.C. §§ 7103(a), 7104(a). The contractor here is the joint venture, CWI-UK. Therefore, the question presented is whether CWI-UK properly submitted a claim under the CDA. In the context of the parties' joint venture agreement, the record demonstrates that the joint venture did not. To the contrary, the purported claim was submitted only by CWI, over the objections of its joint venture partner, UK.

CWI now asserts that the Board "erroneously conclude[d] that CWI, the Lead Party of the Joint Venture, did not have the authority to submit the claim for the Joint Venture." Appellant's Br. at 16. In an attempt to overcome UK's disavowal of the claim, CWI takes the position that it had "Lead Party" authority under the joint venture agreement, including the authority to decide whether to submit a CDA claim. *Id*. at 16-17. But nothing in the joint venture agreement grants CWI the power that it asserts. Article 5 of the joint venture agreement does not expressly define the term "Lead Party," and at most establishes only two things: (1) Mr. Hakki of CWI was nominated as the chairman of the joint venture and Mr. Uejo of UK was nominated as the vice chairman, and (2) Mr. Hakki was to act as the program manager, to represent the joint venture "in all aspects related to communication with the Employer and the operation performance." J.A. 28.

That a program manager may take the lead in communicating with the government does not mean that CWI was empowered to unilaterally decide all joint venture matters. To the contrary, Article 3 of the joint venture agreement prohibits any joint venture party from making agreements in relation to the MATOC without the other party's consent, and Article 3 also requires joint written assent of both parties to form binding joint venture commitments. Additionally, Article 6 requires unanimity in Supervisory Board decisions. These provisions establish a consent and consensus requirement for actions taken on behalf of the joint venture. In light of these provisions, even

if Article 5 can be interpreted as making CWI the Lead Party of the joint venture, the scope of that role is limited to Mr. Hakki's empowerment as the joint venture's chairman and program manager. Nothing more. By its plain language, the provision does not vest CWI with general powers to direct the joint venture's affairs or otherwise make CWI a controlling party. It certainly grants no power to CWI to file a CDA claim unilaterally, much less over the written objections of UK.

The letter dated December 23, 2016, J.A. 929–30, granted some authority to the six individuals listed in the letter, all of whom were also members of the joint venture's Supervisory Board. However, Mr. El Bassiouny, who submitted the claim, was not mentioned in the December 2016 letter and therefore was not granted any authority by that letter. Further, even if the December 2016 letter could be viewed as still in effect, it would not resolve the current situation, where both joint venture parties, irrespective of prior authorizations, made conflicting requests and demands regarding the same matter, namely the validity of the purported CDA claim.[2]

The letter from UK dated January 15, 2021, which listed Mr. El Bassiouny as a member of the joint venture's Supervisory Board, is even less helpful to CWI. Even if the letter had been jointly signed by all joint venture parties,

---

[2]    Prior to oral argument for this appeal, on May 31, 2024, CWI submitted a "Motion to Submit Additional Documentation in Support of its Request for Remand to the Board for Further Proceedings." ECF 34. In this motion, CWI stated that UK has withdrawn all objections to the claim submitted by Mr. El Bassiouny in 2021 and agreed that CWI is the lead party of the joint venture, with the ability to litigate on behalf of the joint venture. *Id.* at 2. These new assertions do not alter the issues in the case before us, nor our analysis. Thus, the motion is denied.

which was required to amend the joint venture agreement pursuant to Article 14, the letter permits no actions without approval of all members of the joint venture's Supervisory Board. Such approval was not provided with respect to CWI's purported CDA claim. Indeed, Mr. Uejo and Mr. Kinjo of UK both objected in writing to the purported claim shortly after it was submitted to the government, and both are listed in the January 15 letter.

Finally, CWI gains nothing from its assertion that the government's position in this matter is contrary to the course of dealing during contract performance among CWI, UK, and the Corps. Appellant's Br. 24. Evidence regarding course of dealing is inadmissible, because the joint venture agreement is unambiguous. *See Alves v. United States*, 133 F.3d 1454, 1459 (Fed. Cir. 1998) ("[A party's] attempt to vary the clear meaning of [a contract] in accordance with the parties' course of dealing is improper under the parol evidence rule.") (internal quotation marks omitted). The Corps' actions in the course of contract administration are irrelevant to interpreting CWI's and UK's joint venture agreement.

## IV

We have considered CWI-UK's remaining arguments and find them unpersuasive. Because the CWI-UK joint venture did not submit a valid claim to the government under the CDA, we affirm that the ASBCA lacked jurisdiction to review CWI-UK's appeal concerning the claim.

## AFFIRMED

### COSTS

No costs.